[File No. 6273.]

PEOPLES OPINION PRINTING CO., a Corporation, Respondent, v. VALLEY CITY GROCERY COMPANY, a Corporation, Appellant.

(257 N. W. 470.)

Opinion filed November 24, 1934.

*Sullivan, Fleck & Sullivan,* for appellant.

*Ritchie & Ployhar,* for respondent.

BURKE, J. The complaint in this action sets forth four causes of

action. The case was tried to the court under Chapter 208 of the Session Laws of 1933. Findings of fact and conclusions of law favorable to the plaintiff on the first cause of action were made and entered by the trial judge and against the plaintiff on the second, third and fourth causes of action. From the judgment entered on the findings favorable to the plaintiff on the first cause of action the defendant duly appeals and there is no appeal on the second, third and fourth causes of action.

The plaintiff claims that there was an oral agreement between the plaintiff and the defendant that said defendant should, through its solicitors and its retail customers, sell subscriptions for the Good Will Messenger, a publication edited and published by the plaintiff, and the defendant agreed to have the said subscriptions taken and upon the receipt of the said subscription price and not otherwise to certify such subscriptions to the plaintiff company and the plaintiff would, thereupon, place the name of the subscriber upon its subscription list, and in the regular course would, as it was published once a week, forward a copy of the Good Will Messenger to the subscriber. That under and pursuant to said agreement between the 24th day of April, 1931, and the 24th day of October, 1931 the said defendant did certify to the said plaintiff that it had received the subscriptions for and payment for such subscriptions, of 7963 subscriptions, and upon receiving such certification from the said defendant the said plaintiff did enter the said subscribers by name as certified to by the plaintiff upon its subscription list and did forward each week, a copy of said paper pursuant to the agreement; that it was further agreed by and between the parties that the subscription price of said subscription would be the sum of one dollar and that the defendant should receive 50% of said sum or fifty cents from each subscription for its services in the matter of obtaining such subscriptions; that by reason of the subscriptions so taken and payment thereof received the said defendant did receive from said subscribers for and on account of the plaintiff, after allowing its commission thereon the sum of $3981.50 and that the said defendant has paid to the said plaintiff on account thereof the sum of $1989 and there is a balance due and owing to the plaintiff from said defendant by reason thereof and for and on account of said subscriptions so certified the sum of $1952.50 together with interest thereon at the rate of 6% from and

after the 24th day of October, 1931. This is plaintiff's first cause of action.

The trial judge, in his memorandum opinion, states: "The testimony in regard to the allegations set out in the first cause of action is very unsatisfactory. The plaintiff claims that the defendant certified or forwarded to it certain lists of subscribers for the Good Will Messenger, from whom it had collected the subscription price. None of these lists are in existence, and none were offered or introduced in evidence. The defendant claims that after 1930 it did not certify or send over any lists to the plaintiff, but forwarded to the plaintiff all remittances for subscriptions as they were received, and that defendant kept no account or books with reference to the same. The plaintiff has entirely failed to prove that between the 24th day of April, 1931 and the 24th day of October, 1931, the defendant had collected the sum of $3981.50, or any other sum, for subscriptions to the Good Will Messenger, and failed to prove that it had certified to the plaintiff that it had received subscriptions for 7963 subscribers for the Good Will Messenger. . . .

"There is no satisfactory proof introduced as to what this charge of $1989 is based on. Mr. Moe in his testimony states that his bookkeeper, Mr. Bowen, handled this matter, and would testify with reference to the certifications or lists received, but Mr. Bowen in his testimony stated that he placed on the list, or retained on the list, the subscriptions that Mr. Moe told him to retain, and that he got all his orders and information from Mr. Moe. Neither of these parties attempted to testify as to how much, if any, money had been collected by the defendant from the subscribers.

"However, the testimony is undisputed that in April, 1932, Mr. Moe presented to Mr. Ward, the manager of the defendant corporation, a bill for $1989, for subscriptions and demanded payment. Mr. Moe testifies positively that Mr. Ward, as manager of the corporation, promised to give him a check for this bill in a few days, and requested him not to start any action. Mr. Ward admits that Mr. Moe called on him and demanded payment of this bill, but denies that he promised to pay it, but stated that he asked him to wait and he would assist in collecting the same from the merchants or subscribers.

"I am of the opinion that Mr. Moe's testimony in regard to this

matter is the true version of what took place, and I am satisfied that Mr. Ward promised to pay this bill in April, 1932."

The memorandum opinion of the trial judge shows that his findings and conclusions are based upon the testimony of Mr. Moe. On page 8 of the transcript Mr. Moe testified as follows:

"Q. Did you have a final settlement with him after October 24th? A. Yes, sir.

"Q. Tell the Court what the settlement was, and who was present?

"Mr. Sullivan: Q. Tell us who was present and what the conversation was? A. The last conversation I had with Mr. Ward relative to this $1,989 was over at the Grocery Company; we had several talks about it.

"Q. . . . Tell us all the talks you had with him, where they were, and what the gist of them was? A. I can't do that.

"Q. Well, give them as best you remember? A. The last demand, the last time I talked with him and insisted on this settlement,—the bookkeeper can tell you better what this cut-off or check-off was. This was given to me. They had checked it over—

"Mr. Sullivan: He is talking now about what the bookkeeper and Ward did.

"The Witness: A. No, I am talking now about what Ward and I were talking about, and I was talking about the cut-off that was given to me by the bookkeeper.

"Mr. Ritchie: Q. He furnished you with a cut-off sheet, did he?

"A. Yes, for the $1989. I had talked with Ward several times previous to that, and he was to pay it. This time I went to his office, and wanted this money paid. This was a day or two before he quit their services, or three days; . . . I went over there and told him I wanted the money. He kind of hemmed and hawed, didn't just have it. 'Well,' I said, 'we want this money. We are not going to let this go any more; we want this paid, and if we don't get it I am going to start action.' He said, 'I don't want you to start any action. I will pay you.' He said that might mean his job. I said, 'I don't want this to affect your job, but I want this money.' He said, 'If you give me until Saturday morning I will give you a check for it.' I said, 'All right, that's fine.' "

This is contradicted by Ward, who testified that he did not agree to

pay it, but did agree to go out and collect it from the stores that represented the Valley City Grocery Company and this testimony would be in accordance with the agreement to collect the money from the subscribers through the stores and after the collection to turn over to the plaintiff 50% of the money collected. On page 19 Mr. Moe testified:

"Q. . . . I think you told us that it was arranged that the Valley City Grocery Company would have its men on the road soliciting subscriptions? A. Through the merchants, I think, mostly. I think the men worked on the merchants.

"Q. In other words, that the traveling salesmen of the Valley City Grocery Company would sell the idea of obtaining subscriptions to their local retail dealers in their territory, is that right? A. I believe so.

"Q. And it was understood and agreed that the local retail merchants over the territory would sell the subscriptions to their customers? A. That was our agreement and understanding. . . .

"Q. And that the customers of the retailer would pay the retailer for the subscription in order that it might be a bona fide subscription under the postal regulations?

"A. That was the plan.

"Q. . . . Then that the local retailer would remit to the Valley City Grocery Company, together with a list of his subscriptions, is that correct?

"A. That was the plan, yes.

"Q. And then that the Valley City Grocery Company would certify those subscriptions to you, and either—and in due course, make remittance?

"A. Yes. . . .

"Q. . . . There was no material change in the subscription arrangement from that we have gone over here, was there? A. No, on the 50-50 basis. . . .

"Q. And upon its receipt of the subscription price, and not otherwise, to certify such subscriptions to the plaintiff company? A. Yes.

"Q. That was the arrangement, was it? A. Yes, surely.

"Q. So this action, as I understand it, Mr. Moe, is an action brought by you to collect from the Valley City Grocery Company moneys which you claim they had collected for subscriptions, and not remitted to you? A. Surely.

"Q. Now then, you say that between the 24th day of April, 1931, and the 24th day of October, 1931, the defendant did certify to the plaintiff that it had received subscriptions, or payment for such subscriptions, of 7963 subscriptions; now, you must have some written evidence some place, Mr. Moe, or some certificate from the Valley City Grocery Company, certifying those names to you? A. Mr. Bowen can explain that to you. He handled that part of it.

"Q. You don't know anything about that yourself?

"A. No, I never handled any of that."

On page 59 of the transcript, Mr. Bowen testified on the same subject, as follows:

"Q. Where is there any evidence of any renewal here; what have you got to show whether they were renewed, any writing of any kind?

"A. Well, I haven't got anything to show only that Mr. Moe told me to keep them on.

"Q. Mr. Moe told you to keep them on?

"A. Yes, and I am working for him, so I kept them on."

On page 50 of the transcript Mr. Bowen testified as follows:

"Q. . . . By whose direction were they kept on the list from October 24, 1931, for the remaining six months' period?

"A. The Valley City Grocery Company.

"Q. That is what Mr. Moe told you? A. Yes.

"Q. You say that is what Mr. Moe told you? A. Yes.

"Mr. Sullivan: Q. You had no personal knowledge in the matter? A. No."

The first cause of action, as shown by the evidence, is based upon plaintiff's exhibit B, which is a bill "To subscription for Good Will Messenger from Apr. 24, 1931 to Oct. 24, 1931............1,989.00 This as per the list left with Mr. Ward, being 25c per subscriber or one half regular subscription price for period of six months."

On page 28 of the transcript, Mr. Bowen testified as follows:

"Q. Where did this 7715 of subscriptions come from?

"A. The Valley City Grocery Company.

"Q. And they were different subscriptions than those that were billed for under this Exhibit B, were they?

"A. Well, you see this bill here (Exhibit B) is billed from April 24, to October 24; that is for a period of six months at 25 cents; and this

here bill (referring to second cause of action) is from October 24 to February 24.

"Q. That is the remaining period?

"A. That is the remaining period that wasn't paid for.

"Q. Now we are getting at it. That is what I want to get at. The bill, Exhibit B, is for a six months' period ending October 24, 1931, is that it?

"A. Yes.

"Q. And this bill (indicating) is for the six months' period following October 24th?

"A. Yes. It wasn't quite six months.

"Q. But it was for that six months' period?

"A. Yes, for that six months' period."

This testimony is submitted by the plaintiff and it clearly shows that the first cause of action, Exhibit B, was for 7955 subscriptions from April 24, 1931 to October 24, 1931, a period of six months for twenty-five cents each and the second cause of action was for 7715 subscriptions from October 24, to February 24, 1932. It further appears from the record that the list, Exhibit C, the second cause of action is made up from the list, Exhibit A, except that upon the new list, Exhibit C, certain names are dropped and new names are added, so that if plaintiff's second cause of action, is a part of the same yearly subscriptions, there would in no event be due the plaintiff the sum of $1989. The plaintiff only claimed $1285.83 on his second cause of action and it could not possibly be that much. On page 49 Mr. Bowen testified "we got specific advice on renewals and they were paid for."

On page 60 of the transcript Mr. Bowen testifies as follows:

"Q. Were all of the subscriptions . . . of the Good Will Messenger paid up a hundred per cent, on April 24, 1931? A. Yes.

"Q. So far as subscriptions were concerned, it was a hundred per cent transaction up to April 24, 1931, that is, they had been all paid? A. Yes."

Mr. Moe testified on page 7 of the transcript "The cut-off was on October 24th. . . . There was a bunch knocked off that had been agreed to be paid up to that time and wasn't paid and we wouldn't carry them any further." On page 9 he testified "The bookkeeper can tell you better what this cut-off or check-off was. This was given to me."

"Q. He furnished you with a cut-off sheet, did he?

"A. Yes, for the $1989."

On page 49:

"The Court: There is one matter here I am not clear on. Exhibit A as I understand it, is a list of subscriptions you had on October 24, 1931, is that correct?

"Mr. Ritchie: That is what I understand.

"The Court: Now then, Exhibit C is a list of subscriptions you had in February, 1932?

"Mr. Ritchie: That is between October 24, 1931—

"The Court: This is what I want to get at: Does Exhibit C also contain all or a part of what is in Exhibit A?

"Mr. Ritchie: No, we do not so understand. Exhibit A is the total for six months' subscriptions up to October 24, 1931. Exhibit C is for subscriptions from October 24, 1931, for the next six months' period. There may be some of the same subscribers.

"Mr. Sullivan: Q. . . . Mr. Witness, they are all the same subscribers, are they not, there are some insignificant few taken out?

"A. Yes, and some added.

"Q. And some added. Where there were any added to it, that was paid for?

"A. That was paid for.

"Q. Any addition was paid for? A. Yes.

"Q. There might have been a few dropped as a matter of correction? A. Yes.

"Q. But the list of the names contained on Exhibit C, and the list of the names contained on Exhibit A, with the exceptions that you have noted, are identical, aren't they? A. Yes."

This evidence shows that the only difference between the list from which Exhibit B was made and the list Exhibit C is that after the cut-off in October 24, 1931 a new list was made from Exhibit A and a number of subscribers were dropped. While, on the other hand, there were a lot of new subscribers who paid for subscriptions, so that even if the second cause of action was before the court it would be impossible from the record, as it now appears, to find any amount that might be due the plaintiff, as the exhibit does not show the number of renewals, the amount paid or the amount unpaid. The defendant did not keep

238

any books or records of the subscriptions and relied altogether on statements made by the plaintiff or its agents. As the trial court states in memorandum opinion, "The evidence is very unsatisfactory." Some matters may have been overlooked in the trial and we all agree that the ends of justice will be best served by remanding the case for a new trial.

The judgment is reversed and the case is remanded for a new trial.

BURR, CH. J., and NUESSLE, CHRISTIANSON and MOELLRING, JJ., concur.